MOHAWK TIRE & RUBBER Company et al
*v.* E. T. BRIDER

74-242                                   518 S.W. 2d 499

Opinion delivered February 10, 1975

*Wright, Lindsey & Jennings,* for appellants.

*Mike J. Etoch Jr.,* for appellee.

J. FRED JONES, Justice. This is a workmen's compensation case in which the employer, Mohawk Tire & Rubber

Company, and its compensation carrier, Travelers Insurance Company, appeal from a circuit court judgment affirming an award of compensation benefits to the appellee-claimant, employee E. T. Brider.

The appellants have designated the points they rely on for reversal as follows:

"There is no substantial evidence in the record that appellee sustained an accidental injury arising out of and in the course of his employment.

There is no substantial evidence in the record that appellee sustained any temporary or permanent disability.

Appellee's claim is barred by the statute of limitations."

We find no merit in the appellants' first two points.

The appellee Brider's testimony as to working conditions and the onset of his physical condition is not contradicted to any substantial degree. According to Brider's testimony, he was employed by Mohawk in 1957, and for about 12 years he experienced no difficulty in unloading trucks and boxcars on a ramp outside the building where tires were manufactured. In April, 1969, he was transferred, at his request, to a better paying job inside the building where he was given the job of "post inflator." This job consisted of removing hot tires from a conveyor belt as they came from the molding machine. According to Brider, the tires were hot and still smoking as they came from the molds and the air surrounding the area was heavily impregnated with smoke, dust and chemical fumes from the hot tires. Brider said that on the third or fourth day he worked as post inflator he suffered chest congestion, shortness of breath and he started coughing. On the fifth day he worked the cough became so severe it caused blackouts and was attended by shortness of breath and wheezing, so he took off from work and went to the company doctor, Dr. McCarty. He stayed off from work for about a week and when he returned, he again experienced the same difficulty. He went back to Dr. McCar-

ty and was admitted to the Helena Hospital where he stayed for one week. Dr. McCarty then referred him to Dr. Milnor in Memphis who had him admitted to the Baptist Hospital in Memphis. He said he stayed in the Baptist Hospital for a week under the care of Dr. Milnor, and upon his return to Helena, Dr. McCarty requested Mohawk to remove him from the job as post inflator.

Brider said when he returned to work, he was assigned the duties of "green tire inspector," but that it was in the same area about seven or eight feet distance from where he worked as post inflator. He said that while working as green tire inspector, he experienced the same trouble of chest congestion, shortness of breath, coughing, wheezing and blackouts. He said he reported his condition this time to supervisor Blackmon and went to see Dr. Daniel Tonymon who gave him a letter addressed to Mohawk advising that he could not work because of his condition. He said he delivered the letter to Mohawk officials and they sent him to another company doctor, Dr. Barnard Copes in West Helena. He said he continued to see Dr. Tonymon for over a year and a half while he was still working off and on at Mohawk. He said Dr. Capes sent him to Dr. Reynolds in Memphis and that he continued trying to work while an outpatient under Dr. Capes at the hospital in Memphis. He said that each time he returned to work, he would experience the same chest congestion, shortness of breath, coughing, wheezing and blackouts; that sometime he would work only one, two or three days before he would have to leave because of the attacks. He said that after working for about two weeks while an outpatient, Dr. Reynolds put him in the Baptist Hospital and performed an operation on July 14, 1971. He said part of his lung was removed in this operation and that following surgery he was off work until March 3, 1972. He said he knew the supervisors at Mohawk knew he was going to Dr. Reynolds because he had been "getting benefits" in the amount of $85 per week from Mohawk, and these benefits ran out in January, 1972. He said he was discharged by Dr. Reynolds on March 3, 1972, whereupon he reported back to Mohawk and was assigned a janitorial job in the same work area of his previous difficulties.

Brider said that while engaged in the janitorial work he again experienced the same difficulty as before and after working about seven days, he had to be off again for a couple of weeks. He then returned to work at the janitorial job but only worked an hour when he again experienced the chest congestion, shortness of breath, coughing, wheezing and blackouts, and that on this occasion he reported his condition to his supervisor and had a guard call his wife who took him to a doctor. He said this time he went to a Dr. Miller because he did not feel he could "make it" to Dr. Tonymon. He said Dr. Miller put him in the hospital at Helena and that his employment was terminated on May 4, 1972. He said the company told him it would assume no further responsibility for medical bills and if he was going to another doctor, he would have to pay for it himself. He said Dr. Miller had made arrangements for his admission to the University Medical Center in Little Rock on May 18, but that he was terminated from employment before that date.

On cross-examination Brider said the last day he worked was April 4, 1972, and that he had not worked any at all for the past five months. He said he was still under the care of Dr. Miller and taking medicine prescribed by him. He said while working as post inflator, he devised a cloth mask he attempted to wear over his mouth and nose but when he was transferred to green tire inspection, the company furnished him a mask and he wore it upon the company's recommendations.

The evidence is rather clear that Brider experienced a violent allergic reaction in his bronchial and respiratory passages while in contact with the smoke and fumes in the tire manufacturing process, but there is a conflict in the medical opinion testimony as to causation and extent of his disability. Brider underwent extensive medical examinations including a lung biopsy and pulmonary function studies. We deem it unnecessary to set out and compare all the medical evidence because we do not weigh the evidence in determining where the preponderance lies in law and compensation cases. In compensation, as in law, cases, we are confined to the record on appeal and if there is any substantial evidence to sustain the findings and award of the Commis-

sion, or jury, we must affirm. This rule is so well established citation is not necessary.

Dr. Daniel Tonymon said he had treated Brider on 53 occasions. He said in his opinion Brider was totally disabled because of the asthmatic attacks and shortness of breath, and Dr. Tonymon was of the opinion the disability was connected to the initial and subsequent exposure to something in the Mohawk plant. None of the chemicals used in the manufacture of the tires was identified except a few of the basic ones identified by a former fellow-employee of Brider. Dr. Robert Dan Miller, Jr., said he first saw Brider for treatment on March 18, 1972, and saw him 32 times between March 18, 1972, and July 31, 1973. He testified substantially as did Dr. Tonymon.

We are of the opinion there was substantial evidence that Brider was partially disabled because of spasmatic bronchial or asthmatic attacks in the presence of various substances, including chemical substances in the air inside the Mohawk plant, and that his contact and initial attack at the plant set his allergic reaction in motion.

The appellants' third point on statute of limitations presents some difficulty. Ark. Stat. Ann. § 81-1318 (Supp. 1973) provides as follows:

"Filing of claims. — (a) Time for filing. (1) A claim for compensation for disability on account of an injury (other than an occupational disease and occupational infection) shall be barred unless filed with the Commission within two [2] years from the date of the injury. * * *"

Ark. Stat. Ann. § 81-1302 (i) (Repl. 1960) defines "compensation" as follows:

" 'Compensation' means the money allowance payable to the employee or to his dependents, and includes the allowances provided for in section 11 [§ 81-1311], and funeral expense."[1]

---

[1]Ark. Stat. Ann. § 81-1311 (Repl. 1960) provides for medical payments.

Ark. Stat. Ann. § 81-1318 (b) (Supp. 1973) reads as follows:

"(b) Additional compensation. In cases where compensation for disability has been paid on account of injury, a claim for additional compensation shall be barred unless filed with the Commission within one [1] year from the date of the last payment of compensation, or two [2] years from the date of injury, whichever is greater. The time limitations of this subsection shall not apply to claims for replacement of medicine, crutches, artificial limbs and other apparatus permanently or indefinitely required as the result of a compensable injury, where the employer or carrier previously furnished such medical supplies."

On July 24, 1971, Dr. Leslie B. Reynolds, Jr., reported on Travelers Insurance Company (group insurance) form as follows:

"undiagnosed lung disease manifested by restrictive ventilatory impairment and intermittent bronchospasm. * * * Patient to be hospitalized for rib and lung biopsy. . . ."

On August 13, 1971, Dr. J. C. Lougheed reported on a similar form as follows:

"Pulmonary insufficiency and infiltration — cause undetermined. Dense pulmonary adhesions."

Both of these reports state that Brider was disabled to work and would be so disabled for an undetermined period of time.

On August 20, 1971, Dr. Reynolds reported on Travelers form as follows:

"Pulmonary fibrosis with intermittent bronchospasm. * * * Lung biopsy 7-6-71 showed slight pleural and parenchymal fibrosis and anisotropic crystals *presumably from inhaled material*. Sample sent to Armed Forces Institute of Pathology, Washington, D.C. for analysis.

Patient showing only minor improvement with corticort therapy and must still be considered disabled." (Our emphasis).

On February 7, 1972, Dr. Reynolds submitted a letter-report reading in part as follows:

"The patient still has a restrictive ventilatory defect, which would limit his activity. This is probably permanent. Until the nature of the inhaled material is determined, it cannot be positively established whether this is responsible for his disability. We are making every effort to obtain these data. I feel some sort of rehabilitation is in order, however, and believe Mr. Brider should attempt to return to light work on a gradual basis. Should he have attacks of bronchospasm as has been demonstrated before, certainly he cannot work. However, based on the data we have, I feel Mr. Brider can resume limited activity on a gradual basis. He should be watched by your plant physician, with whom I would be glad to discuss his care in greater detail.

I am submitting our statement with this letter."

On February 28, 1972, Dr. Reynolds wrote a letter to Mohawk as follows:

Mr. Brider called me today and stated that, in the absence of a specific statement from us, he is unable to obtain employment of any type. I have gone over our records and have discussed this matter in some detail with Dr. Lougheed, the surgeon who did the lung biopsy on Mr. Brider, with reference to his probable capacity to work and, while we have not defined Mr. Brider's ability to work, we can only restate that he has distinct lung pathology. Pulmonary functions show he has a mild, restrictive ventilatory defect. Periodically, he has attacks of bronchospasm characterized by a severe obstructive ventilatory defect and a decreased amount of oxygen in his blood. We have not established the cause of these attacks of bronchospasm but *we suspect they may be related to inhaled material seen as microscopic refractile bodies in sections of his lung.*

Apparently, the distinct statement relative to the weight Mr. Brider can carry is required by both your institution and the union. After extensive consultation, Dr. Lougheed and I agree that the following statement can be made: Attempts should be made to give Mr. Brider employment which would involve light work. We assess that he may carry 20 to 25 pounds without too much difficulty; however, he should not attempt to carry more than 75 pounds *Between these limits, working conditions such as the presence of dust, or other materials which may cause his attacks of bronchospasm would change the picture.* It is expected that with a gradual increase in work load, Mr. Brider should gradually increase his work capacity." (Our emphasis).

Brider first inhaled the fumes and experienced his first difficulty during the week between April 21 and April 28, 1969. He was sent to the doctor on April 22, 1969. The last injurious exposure to the chemical fumes at Mohawk occurred on March 10, 1972, and Brider filed his claim with the Commission on April 12, 1972. It was Brider's first contention that his bronchial condition was an occupational disease or infection and the statute of limitations did not commence running on his claim until March 10, 1972, the date of his last exposure. The occupational diseases are set out in Ark. Stat. Ann. § 81-1314 (Supp. 1973) but asthmatic conditions or pulmonary allergic reactions to chemicals, fumes or substances (not resulting in dermatitis) are not among the diseases so listed, and this court is without authority to add to the list. *Barentine* v. *Gleghorn Oil Co.*, 254 Ark. 182, 492 S.W. 2d 242.

Brider's second contention was that he had been paid compensation in the amount of $85 per week and also medical benefits from January 18, 1970, to January 18, 1972, and that he filed his claim within one year of the last payment as permitted under § 81-1318 (b), *supra*. Mohawk contended that the $85 per week paid to Brider was under an entirely separate nonoccupational insurance policy and did not constitute the payment of workmen's compensation in any sense of the word.

In awarding compensation benefits the Commission found as follows:

"The claimant suffered an injury, notified his supervisor, and the respondents provided medical care and paid him $6,784.66 in weekly compensation benefits under a company health and accident insurance policy.

The claimant's claim was filed within a year of receiving medical benefits (compensation) and therefore, his claim is not barred by the Statute of Limitations (81-1318 [b]), *Reynolds Metals Company* v. *Brumley*, 226 Ark. 388.

It is further the opinion of the Commission that the actions of the respondents have estopped them from pleading the Statute of Limitations."

We are of the opinion the statute was tolled in favor of Brider in this particular case. Mohawk had procured workmen's compensation insurance coverage from the coappellant, Travelers Insurance Company and, in carrying out its employment contract with Brider and other employees through their labor union, Mohawk also procured from Travelers a group policy providing accident and sickness benefits for employees as follows:

"Section C — Accident and Sickness Benefits
Effective November 1, 1970, and for the duration of this Agreement thereafter, the Employer will provide the following plan of accident and sickness benefits for all Employees.

1. Accident and Sickness Benefits for Employees
a. General — Benefits will be paid because of a disabling accident or sickness while under the care of a doctor licensed to practice medicine.
Benefits will be payable from the first day of disability *due to accident or occupational illness*, the eighth day of disability due to non-occupational sickness or the first day of hospital confinement if occurring prior to the eighth day. Benefits will be paid for the duration of the disabili-

ty not to exceed 52 weeks for each period of disability. *
* *

b. Benefits — The amount of weekly benefit will be
$85.00. The amount of weekly accident and sickness
benefits otherwise payable will be reduced for each week
in excess of 26 weeks of benefits during any one con-
tinuous period of disability. * * *

2. Deduction for Workmen's Compensation Benefits
In the event that an Employee received weekly compen-
sation under a Workmen's Compensation Act for any
period with respect to which he is also entitled to weekly
benefits under Paragraph 1 of this Section C, the
amount of such weekly compensation payable under
such Act shall be deducted from the amount of the
weekly benefit otherwise payable to such Employee un-
der said Paragraph 1." (Our emphasis).

As already pointed out, the appellant Travelers In-
surance Company had both compensation and group
coverage on Mohawk employees. The group policy was
payable from the first day of disability due to accident or oc-
cupational illness and provided for payments in the amount
of $85 per week. The weekly payments were larger but of
shorter duration than compensation payments under the
workmen's compensation coverage.

Brider started drawing disability payments under the
group policy October 27, 1970, and was paid intermittently
through January 18, 1972. These payments were made on the
basis of the company physician's diagnosis of "bronchial
trouble." The payments were apparently made following ex-
ecution of "claim statement" and "release of medical infor-
mation" forms by the claimant-employee and the attending
physician. Only one set of these completed forms appears in
the record. There is no evidence as to who actually filled out
the forms but on the *claim statement* form dated October 31,
1970, and signed by attending physician C. P. McCarty, the
cause of disability was designated "bronchial trouble," and
the question as to whether the disability was due to accident,
was answered "no." This form was signed by E. T. Brider

but there is a handwritten "X" preceding his signature in-cidating that someone other than Brider filled out the form and designated the place where Brider was supposed to sign. This form is in the record as "respondent's exhibit No. 3" and attached thereto is "release of medical information" form dated April 3, 1970, signed by Brider. Part "B" of this form is designated "attending physician's statement." Dr. Daniel Tonymon signed this form under date of April 6, 1970, and under "Diagnosis and Concurrent Conditions" he stated:

> "Chronic *allergic* bronchitis complicated by bronchial vascular congestion and spasm." (Our emphasis).

The Commission found that all medical treatment to date of the hearing had been paid by Travelers, and that the claim for medical treatment had not been controverted in this case. Under our statute Ark. Stat. Ann. § 81-1302 (i) (Repl. 1960), *supra,* compensation means the money allowance payable to the employee or his dependents *and includes medical payments.* We have held that the furnishing of medical services constitutes payment of compensation and is a waiver or suspends the running of the statute of limitations. *Reynolds Metal Co.* v. *Brumley,* 226 Ark. 388, 290 SW. 2d 211. In such cases the statute of limitations runs from the date of the last treatment. *McFall* v. *U.S. Tobacco Co.,* 246 Ark. 43, 436 S.W. 2d 838; *Heflin* v. *Pepsi Cola,* 244 Ark. 195, 424 S.W. 2d 365.

As already stated, § 81-1302, *supra,* defines "compensation" as meaning "the money allowance payable to the employee or to his dependents . . ." and we have held that compensation refers to money benefits paid to the injured employee for disability. *Brooks* v. *Ark. Best Freight,* 247 Ark. 61, 444 S.W. 2d 246. In the case at bar, as already stated, the appellant insurance carrier had both the compensation and group insurance coverage for Mohawk. The group coverage benefits were also payable for disability due to accident or oc-cupational illness and were in excess of the amount payable under the workmen's compensation coverage required by law. In Larson, Workmen's Compensation Law, § 78.43 (a) is found the following:

"When payment of either income or medical benefits has been made by a private employer-employee benefit association or insurance plan, this has usually been held to toll the statute."

We deem it unnecessary to discuss this case from the viewpoint of whether the statute runs from date of accident or from date of injury (as amended in 1948), or whether our statute is purely a statute of limitations or repose and goes to the remedy rather than the right; for, we conclude that the statute of limitations in this case was tolled by the payment of compensation in the form of medical benefits, if not included in the $85 weekly payments credited by Travelers to its group coverage. We further conclude that the Commission did not err in holding that the respondent insurance company was estopped from pleading the statute.

The judgment is affirmed.

FOGLEMAN, J., dissents.